**Chris A. Johnson, JD**
**Highbanks Insurance Professionals**
318 S. Broadleigh Road
Columbus, OH 43209
614-315-8926
www.hip-consulting.com
chris.johnson@HIP-Consulting.com

March 31, 2021

Ms. Tamara S. Sack
Attorney At Law
130 W. 2nd St. Suite 310
Dayton, Ohio 45402-1534

Mr. Paul M. Laufman
Attorney At Law
Laufman Napolitano, LLC
4310 Hunt Road
Cincinnati, Ohio 45242

Re: Your Client – Mr. Brian Higgins
    Claim No. 00101591495
    Insurer – Assurant (Standard Guaranty Insurance Company)
    Date of Loss – July 11, 2014

Dear Ms. Sack & Mr. Laufman,

You have asked me to provide you with my expert opinions and analysis regarding the above captioned insurance claim that involved covered water damage to the insured residence located at 7240 Meeker Creek Dr., Dayton, Ohio 45414. (Meeker Residence). My review will focus upon the manner in which this residential property policy was placed, the ensuing claims process that directly involved both Assurant and the Mortgage Company identified as Nationstar, and the repairs to the Meeker Residence.

My opinions expressed herein are made to within a reasonable degree of certainty in insurance industry standards, practices and customs. My qualifications to express these opinions include over 35 years of education, training and experience in the insurance industry, the details of which can be found in my attached Curriculum Vitae.

My experience, education and training in the insurance industry includes addressing and resolving insurance policy and claims issues arising under homeowner and commercial property insurance contracts relating to mortgage lenders or others with a similar interest in the insured property. The review of this matter requires an analysis of both the Assurant insurance contract and the Nationstar Mortgage documents.

1

My hourly fee for professional services is $225.00. Payment for my services is not contingent upon the content of my opinions expressed herein, nor is it contingent upon the eventual outcome of this matter.

## I. BACKGROUND

The policy issued by Assurant (Standard Guaranty Insurance Company) is titled a Residential Dwelling Certificate. Nationstar is listed as the only NAMED INSURED on the Declarations page of the policy. Chonda Higgins is listed on the Declarations page under the caption "BORROWER". The Declarations page references Loan No. 0610395576-011D associated with Chonda Higgins, BORROWER.

A water damage claim occurred at the insured Meeker Residence. The Notice of Loss details a loss date of 7/11/2014, with the claim being reported on the same day. The Notice of Loss form lists Nationstar as the Named Insured, and Chonda Higgins as a Primary Additional Insured. The claim was reported to Assurant and Nationstar by Mr. Higgins.

Excerpts from Case No. 3:18CR186TMR, SECOND SUPERSEDING INDICTMENT:

- *By summer 2014, the Meeker Residence was in financial distress. In the preceding years, neither defendant Brian Higgins nor C.H. had made a mortgage payment on the Meeker Residence to Nationstar or any other financial institution. The property previously had been in foreclosure, and the non-payment of the mortgage again placed it at significant risk of lapsing into similar proceedings once more. Additionally, various entities had placed on the Meeker Residence thousands of dollars in liens representing judgments against the defendant Brian Higgins.*
- *Despite the financial distress of the Meeker Residence, Nationstar obtained for its benefit and that of C.H., homeowner's insurance on the property. This insurance was designed to provide funds to repair any damage to the Meeker Residence, thereby protecting the value of the property for Nationstar as well as this mortgage company's financial interest in this residence.*
- *In or around July 2014, while defendant Brian Higgins resided at the Meeker Residence, the property sustained significant water damage from an apparent leak in a large fish tank. Soon thereafter, defendant Brian Higgins submitted a claim in the name of C.H. to Assurant concerning the water damage. In submitting this paperwork, defendant Brian Higgins understood that Assurant and Nationstar intended for him to use any money disbursed on the claim to fund and complete bona fide repairs of the Meeker Residence. Neither Assurant nor Nationstar authorized or expected defendant Brian Higgins to divert this money…*

Assurant inspected the damage to the Meeker Residence and prepared their estimate of damage repairs. The indictment reads that the insurance funds were not released in a lump sum; factually though, they were. A check in the amount of $124,181.76 was issued on or about 9/4/2014 by Assurant and mailed to Nationstar who is the **Named Insured** on the policy Declarations page.

2

As this was a "replacement cost" policy, the $124,181.76 represented the "actual cash value" of the loss, with $6,385.10 in recoverable depreciation due and owing once the damaged property was repaired/replaced

A contractor was secured to repair the property and repairs ensued. Draws were made upon the claim funds being held by Nationstar. The record reflects that on 12/09/2014, just 5 months post-loss, the repairs to the Meeker Residence were completed to 65%.

On or about 12/09/2014, the contractor was terminated with some repairs yet to be completed. Chonda and Brian Higgins advised Nationstar and Assurant of this development and the record reflects confirmation that the contractor, United Demolition had been paid in full.

The claim then became stalled as an additional draw and funding to complete the repairs would be required. There was an indication recorded in the Nationstar notes that the insurance company underestimated the repair costs for the water damage.

## II. OPINIONS HELD

I hold the following opinions, to a reasonable degree of professional certainty:

### 1) Mr. Higgins had an insurable interest in the Meeker Residence

There are a multiple of facts in support of Mr. Higgins insurable interest in the Meeker Residence:

- The 2010 Final Judgment and Decree of Divorce filed In The Common Pleas Court Of Montgomery County, Ohio, Case No. 2007-DR-01359, page 3, REAL ESTATE, *"The Court further finds that the parties have agreed that the Plaintiff (Mr. Higgins) shall retain the real estate located at 7240 Meeker Creek Drive, Dayton, Ohio 45414."*
- The Divorce Decree provided for Mr. Higgins to eventually be deeded the entirety of the Meeker Residence
- Mr. Higgins was residing in the Meeker Residence when the Assurant policy was procured by Nationstar
- Mr. Higgins is listed as a "Borrower" on the Mortgage and he apparently signed the last page of the Mortgage and initialed each of the preceding 11 pages.
- Page 1 of the Second Superseding Indictment confirms that **"Brian Higgins held an interest in the Meeker Residence..."**

### 2) Nationstar and Assurant should have included Mr. Higgins as a Borrower on the Assurant Certificate along with Chonda Higgins, but they neglected to do so.

There is no explanation, given all of the above facts, to indicate why Mr. Higgins was not included on the Assurant policy as "Borrower" or Primary Additional Insured. While both Assurant and Nationstar treated Mr. Higgins as if he were an insured (see 2/4/2015 letter from Assurant addressed to BRIAN HIGGINS, referring to him as *"any persons insured under this*

3

*Certificate…"*). However, in the caption of the letter, the insured is listed as Nationstar, with the Additional Name: CHONDA HIGGINS, it does not list Brian Higgins in any capacity.

Assurant's August 15, 2014 letter addressed to CHONDA HIGGINS again only identifies her in the Additional Name caption, **it does not list BRIAN HIGGINS**. The Notice of Loss form in this claim only lists CHONDA HIGGINS as a Primary Additional Insured.

It is interesting to note that Mr. Higgins was referred to repeatedly in the first few months of this claim as an unauthorized person when he called in to speak with someone at Nationstar. However, he was the only person on the ground and in-residence to assist Nationstar and Assurant with the claim.

Eventually Mr. Higgins became an "authorized" person for Nationstar to transact business with on the claim. The authority seems to be a verbal authority from a 3rd Party authorizing Party Relative Brian Higgins. This is in a log note dated 12/09/14. (Nationstar-000264 & 000302).

**3) Because of Mr. Higgins's insurable interest, and for other reasons, Mr. Higgins had a reasonable expectation to receive portions of the Actual Cash Value (ACV) payment made by Assurant**

Regardless of Assurant and Nationstar not listing Mr. Higgins on the Certificate, Mr. Higgins was treated as an insured by Assurant and Nationstar under the policy through their actions and informed decision-making throughout the course and processing of this claim. As noted previously, Assurant was actually corresponding directly with Mr. Higgins as an insured under the Certificate.

The ACV payment is an up-front payment made before any repairs are done; it is designed to allow for advance payments of funds – cash - to the insured. ACV payments are generally deposited into a common savings and/or checking account, there are no restrictions that would require the funds to go into a dedicated non-comingled bank account. Therefore, the funds paid in the form of claims benefits are often co-mingled with other monies. This is not uncommon.

Nor is it uncommon that those monies are not used immediately for repairs and restoration. On large property losses, as in this case, arranging for a contractor, sub-contractors and materials often presents a scheduling challenge. The repair estimate in this case done by Adjuster Shawn Joers was extensive, including woodworking, carpeting, painting, drywall and electrical in numerous rooms of the Meeker Residence. Coordinating these repair disciplines and scheduling the work takes time.

Notwithstanding the Mortgage on the Meeker Residence, an ACV payment made in a claim like this can be used to either repair the residence or can be used for other purposes not related to the residence. While the Mortgage does have language indicating that claims funds will be used to repair the property, it doesn't have a provision that requires a Borrower to sign a contract addendum or other form that, in essence, uses similar language.

4

**There is no authority in the Nationstar Mortgage that would require Mr. Higgins or Chonda Higgins to sign and return the Certification of Intent to Repair.**

There are various references to repair work that Mr. Higgins was either doing or managing at the Meeker Residence. It is a Standard and Practice in the insurance industry for claims adjusters to make advance payments for debris removal, mitigation efforts, protection of insured property from further loss, and repairs done by or on behalf of insureds.

The policy reads at Page 5 of 8, 4. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

a. Give prompt notice to us or our agent;
b. (1) Protect the property from further damage;
   (2) Make reasonable and necessary repairs to protect the property; and
   (3) Keep an accurate record of repair expenses

It is usual and customary in the insurance industry that advance funds be made available for these and other types of expenses and repairs.

**Mr. Higgins would reasonably expect to be compensated out of the ACV funds made available for the claim.**

**Finally, the file clearly reflects at various points that the work was 65% complete when United Demolition was terminated from the job.**

**4) The estimate of repairs to the Meeker Residence follows the form and style of other property damage repair estimating tools found in the insurance industry, similar to Xactimate, and cannot be relied upon as an EXACT repair cost for this claim.**

The repair estimate prepared by Shawn Joers was done using a software tool commonly used in the property insurance industry. The tool uses average pricing, based upon geographic locations, for various repair elements - painting, roofing, carpentry, water and smoke remediation, and other repair professions and disciplines. The repair tool also calculates depreciation, providing both an ACV and RCV calculation for use by the insurer to make the up-front ACV payment. This is the payment of insurance benefits that the insurance company makes up-front to meet their obligations of good faith claims handling.

However, in the event the property can be repaired for a lower cost, say if the insured or someone on their behalf repairs the property themselves for less money, then the remaining ACV money, along with a claim for recoverable depreciation, belongs to the property owner.

This is not an uncommon scenario – an insured acting as their own general contractor, hiring the subs and performing the work. An insured or someone on their behalf can also participate in the repairs and management of repairs. This can significantly reduce the cost of overall repairs compared to the repair estimate produced by a software estimating program.

It is equally true that the software estimating program can undervalue the repair costs of a claim. For instance, the software program does not actually align you with a contractor who is willing to do the work for the amounts listed in the estimate. Software programs use average pricing and do not take into account local or temporary spikes in pricing due to shortages, demand and availability.

Contractors and insurance adjusters understand that software estimate is a working tool, a guideline, but that the eventual cost of repairs could vary significantly. This could easily lead to a request for supplemental funds from the insurer.

The typical draw of ACV funds on a claim of this nature is one-third of the estimate price. This one-third is used to pay the contractor in advance to begin the project. No one really knows where the money goes once it is paid to the contractor. The contractor may immediately use the funds to float the purchase of materials or pay subs on another job. This is the nature of the construction business.

**5) Assurant and Nationstar knew that Chonda Higgins had abandoned the Meeker Residence and was living in another state. Without the cooperation of Chonda Higgins, Assurant could only rely upon Nationstar, the NAMED INSURED, to manage the claim and repairs to the Meeker Residence; both Nationstar and Assurant were reckless in their handling of this claim and disbursement of funds to others not insured under the Certificate**

The record reflects that Nationstar attempted to contact Chonda Higgins shortly after the loss date to discuss the claim and/or to obtain an authorization to work with someone else on the claim. Chonda Higgins said she didn't understand why people were contacting her about this matter, thinking that the couple's 2010 divorce decree resolved any connection she had with the Meeker Residence.

At this point, it was Nationstar's responsibility under the terms of the insurance Certificate to secure a credible contractor to assure repairs. As read in the Mortgage document, Nationstar retained significant rights to control the Meeker Residence in the event of abandonment. Even though the Nationstar log notes reflect several phone calls with Chonda Higgins, it's evident that Mr. Higgins was the primary contact for Nationstar.

Both Assurant and Nationstar knew that the Meeker Residence had been in significant financial distress as described in the Indictment. Those include late mortgage payments, foreclosure actions, various liens and judgments, IRS and State of Ohio Taxation issues. NationStar was reckless in their handling and disbursement of claim funds with knowledge of Mr. Higgin's apparent struggles with money management.

Assurant was reckless in failing to make direct contact with Chonda Higgins to discuss this loss.

Assurant:

- Was confused about the status of Mr. Higgins as an insured under the policy, addressing a letter to him accusing him of insurance fraud
- Knew or should have known that Mr. Higgins was not listed on the Certificate in any capacity
- Voluntarily and knowingly worked directly with Mr. Higgins in the reporting of this claim, the repair work being done and communications about the claim

### 6) Assurant and Nationstar's inspection of on-going repairs indicated the work was being done and that they were satisfied with the work

The record reflects that the Meeker Residence repairs were inspected on 12/09/2014 by a third-party vendor, CoreLogic. The inspection found that the Meeker Residence repairs were 65% complete.

The file notes document various thresholds for repair – 50%, 65%, 90% and 100%. inspections were conducted showing that the work was being done on the Meeker Residence to repair the water damage. There is no dispute that Nationstar and Assurant had the right to inspect the property at any time and as often as they deemed reasonable.

If Nationstar, Assurant or their designated representative failed to properly inspect, timely inspect, or inspect in any reasonable manner or detail, the work being performed, then that is a failure solely attributable to them. The estimate of repairs done by Assurant and provided to Nationstar is 13-pages long and includes almost 200 line-items entries for the estimated repairs. There isn't any indication that Nationstar or Assurant were ever refused access to the property at any time.

It would be a fairly easy periodic inspection process to meet at the Meeker Residence and begin ticking off the repairs that have been done. With all due respect, these are not the type of repairs that are somehow easily hidden, concealed or camouflaged.

The goal was to achieve 100% of the repairs complete. The Meeker Residence was at 65% when the contractor was terminated. This development alone can create delays and increase the cost of final repairs. As referenced, writing an estimate of repairs is not an exact science. Quite often, supplemental estimates are required to account for hidden damage, collateral damages, increased costs or other circumstances.

It isn't a surprise that a supplemental request for additional claim benefits was made on an extensive water damage claim like this.

### 7) Mr. Higgins Followed The Terms and Conditions of the Nationstar Mortgage documents

**The Nationstar Mortgage lists in Paragraph (B) – "Borrower" is Chonda B. Higgins and Brian Higgins Wife and Husband.**

**Section 5. Property Insurance** details the Borrowers duties to maintain insurance on the Meeker Residence. This section gives Nationstar the right to procure insurance on the property

7

should the Borrower fail to maintain any of the coverage described in this section. It also addresses what happens in the event of a property claim.

Excerpts from this section include:

- *...such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.*
- *In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower, Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.*
- *If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, <u>with the excess, if any, paid to Borrower.</u>* (Emphasis added)
- *If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.*

There are at least two other sections of the Mortgage that give specific rights to the Lender should the Borrower abandon the Property. It should have been clear to both Assurant and Nationstar that Chonda Higgins was not living at the Meeker Residence and was not assisting in any meaningful manner with the processing of the claim.

On the other hand, Mr. Higgins was actively engaged in moving the claims process along. The call logs reflect numerous calls into Nationstar from Mr. Higgins regarding the claim status. It appears Mr. Higgins was cooperative and helpful as the on-site resident. He was assisting to manage the contractor and work being performed.

**Nationstar's Mortgage document reads that Nationstar doesn't have to pay or release ANY funds unless and until the work and repairs are done to their SATISFACTION. Nationstar was notably satisfied with the work and progress.**

**8) Any inference that Mr. Higgins was involved in insurance fraud isn't supported by the records reviewed**

Mr. Higgins received a letter from Assurant, dated 2/4/2015, accusing him of Concealment or Fraud. There is nothing further related to these allegations in the file materials reviewed.

8

The Assurant letter is confusing and filled with inaccuracies. It refers to Mr. Higgins as an insured under the Certificate. Recall that Mr. Higgins wasn't listed as a Borrower or an insured on the Assurant policy.

A letter of this nature, essentially a coverage denial letter, must be written with a detailed description of facts and circumstances being relied upon by Assurant. The fact that Assurant is writing a coverage denial letter to a non-insured is absurd.

It is unknown whether Assurant, because of their deficient investigation of the facts and coverage in this claim, just didn't understand Mr. Higgins's role in this claim, or if they're unfamiliar with insurance industry practices and standards when writing such a letter. In any event, this letter should have never been sent to Mr. Higgins.

**9) The Certification of Intent to Repair was null, void, defective and unauthorized - Assurant and Nationstar had no contractual relationship with Mr. Higgins and no authorization to transact business with him, therefore all communications, written and verbal, with Mr. Higgins, were voluntary.**

A review of the Assurant policy and Declarations page shows that Mr. Higgins is not listed in any capacity as a Borrower or Additional Insured. Assurant did not include him on their ACV payment check that was issued to Chonda and Nationstar. Any communications, verbal and written, between Assurant and Mr. Higgins, were voluntary and on Assurant's part.

Nationstar's log notes indicate they would not even speak with Mr. Higgins, referring to him as an UNAUTHORIZED person. The only "authorization" found in the records is a log note dated 12/09/14 referring to a verbal exchange with someone known as a 3rd Party. The Certification of Intent to Repair (Nationstar-000095) was signed in early October 2014 and received by Nationstar on 10/08/2014. (Nationstar-000267). Please note this was two months before Nationstar documents a verbal authority from 3rd Party to speak with Mr. Higgins about the claim.

On this topic, the verbal authority to speak with Mr. Higgins seems to be limited to just that - speaking with him. There isn't a Power of Attorney or some other authorization form in any of the file materials reviewed.

The Primary Borrower's Signature line has what appears to be the following in cursive handwriting - "for Chonda Higgins". We know that Nationstar considered Mr. Higgins an unauthorized party, there are numerous references to this throughout their log notes. Nationstar had a sample of Chonda's signature in their records on the Mortgage in at least three different locations in that 12-page document. Even the untrained eye can see the purported signature on the Certification of Intent to Repair was not signed by Chonda Higgins. The fact that it appears to include the qualifier "for" is also an obvious indication that the document was not signed by the Primary Borrower as called for on the document. Nationstar was aware that Chonda Higgins was not residing at the Meeker Residence.

9

There is absolutely no provision in the Mortgage agreement that would require Chonda Higgins, or for that matter, Brian Higgins, to sign this separate document certifying an intent to repair the Meeker Residence. The Mortgage language reflects the parties rights and interests under the Mortgage agreement. Nationstar should have simply sent a letter to Chonda Higgins reminding her of the provisions in the Mortgage agreement. However they sent an unauthorized form not provided for or referenced in the Mortgage. Page 1 of the Mortgage reads: (A) Security Instrument" means this document, which is dated February 22, 2007, together with all Riders to this document. Under Riders, this form is not identified or referenced in any manner.

**To be clear, Nationstar had a duty to pay for the repairs being made to the Meeker Residence. <u>This is true even if the Nationstar Certification of Intent to Repair was never signed and/or returned.</u> There is no language in the Mortgage that would have given Nationstar the right to withhold payments in the absence of the Certification of Intent to Repair.**

Assuming arguendo that the Certification of Intent to Repair was legitimate and authorized by the Mortgage, and assuming this were a valid signature, the language of the form really focuses upon the work being done in a workmanlike manner and that no material or labor liens will occur as a result of the labor performed or materials used.

I do not see any evidence in the documents reviewed that the work, at 65% completion, was substandard in any way. As previously noted, Nationstar retained significant inspection rights throughout the repair process, with inspections apparently documenting work completed to the 50% and 65% levels by CoreLogic, a third-party vendor. There were no log notes reviewed indicating any issues with workmanship. Neither were there any material or labor liens occurring on the property. Nationstar's file documents that the contractor who was terminated was Paid In Full.

It should also be pointed out that the certification to use all Assurant claim funds to repair the water damage was actually controlled by Nationstar. Nationstar had possession of and controlled every cent of the claim funds paid by Assurant. If there was any failure of diligence in how the Assurant claims funds were handled, it was Nationstar's.

The Certification of Intent to Repair identifies the claim funds as belonging to Assurant. Actually, Assurant's claim funds were paid in total to Nationstar. The money in Nationstar's account belonged to them. Nationstar cold have easily taken the funds and applied them to the arrearage in the Mortgage. The Certification of Intent to Repair does not mention Nationstar's money. Note that the claim funds were paid by Assurant to Nationstar on 09/04/2014 and deposited into a Nationstar account. The Certification of Intent to Repair is dated about one month later in early October 2014.

At the time the Certification of Intent to Repair was purportedly signed, the claim funds paid to Nationstar had lost their identity as Assurant claim funds and were deposited into a Nationstar account. Any reference to Assurant claim funds is thus false and misleading. The record does not indicate that Mr. Higgins ever received Assurant claim funds.

The typical remedy for a breach of the terms of a Mortgage Agreement, or a breach of a Certification of Intent to Repair, is a civil contract action for specific performance, damages under the contract, or injunctive relief.

### III. SUMMARY

The expert opinions expressed herein are made to within a reasonable degree of certainty in insurance claims practices, standards and customs. As noted earlier, when reviewing a claim of this nature where Assurant and Nationstar are inextricably involved in the payment of claims benefits and decision-making, it is important to review the claim from both perspectives.

It is my expert opinion that Nationstar voluntarily made claim payments of insurance proceeds to non-insured parties. Mr. Higgins had a number of reasons why he might be entitled to funds from the ACV payment made by Assurant.

Respectfully submitted,

Chris A. Johnson, JD