**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:18-cr-186 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| **BRIAN HIGGINS**, | : | |
| | : | |
| Defendant. | : | |

---

**ENTRY AND ORDER GRANTING IN PART AND DENYING IN PART**
**GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY OF PROPOSED**
**DEFENSE EXPERT (DOC. NO. 91)**

---

Pending before the Court is the United States of America's (the "Government") Motion to Exclude Testimony of Proposed Defense Expert (Doc. No. 91) (the "Motion"). In the Motion, the Government moves to exclude the proposed testimony of Chris A. Johnson ("Johnson"), pursuant to Federal Rules of Evidence 402, 403, 702, and 704 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. No. 91.) The Government argues that Defendant Brian Higgins ("Higgins") has failed to establish the admissibility of the testimony of his expert, Johnson, because "(1) the proposed expert lacks the qualifications to opine on key matters in the report and (2) the proffered testimony is irrelevant, otherwise unhelpful to the jury, unreliable, and prejudicially confusing." (*Id*. at PageID 852.) For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

I.     **BACKGROUND**

        a.  **Higgins' Alleged Conduct**

A federal grand jury charged Higgins with three counts of mail fraud in violation of 18

U.S.C. § 1341 and 2; two counts of witness tampering in violation of 18 U.S.C. § 1512(d)(1); and two counts of witness retaliation in violation of 18 U.S.C. § 1513(e).[1]  (Doc. No. 95.)  The charged crimes stem from his alleged participation in a scheme to defraud his mortgage holder, Nationstar Mortgage, LLC ("Nationstar"), between 2014 and 2015.  (*Id.*)

The Government's Fourth Superseding Indictment (the "Indictment") alleges that Higgins' former home in Dayton, Ohio (the "Meeker Residence") was financially distressed.  (Doc. No. 95 at PageID 897.)  No mortgage payments were made on the Meeker Residence for a number of years.  (*Id.*)  Higgins held an interest in the Meeker Residence with his ex-wife, Chonda Higgins, who did not reside there during the times relevant to the Indictment.  (*Id.* at PageID 895.) Nationstar serviced the mortgage on the Meeker Residence and obtained insurance on the residence from Assurant, through a related entity named Standard Guaranty Insurance Company, to protect its interest in the residence.  (*Id.* at PageID 897-98.)

According to the Indictment, in July 2014, Higgins submitted an insurance claim with Assurant related to property damage caused by a leak in a large fish tank at the Meeker Residence. (*Id.* at PageID 898.)  In response, Assurant disbursed the insurance claim funds to Nationstar.  (*Id.*) Nationstar decided to release the funds through a series of draws.  (*Id.* at PageID 899.)  Nationstar required the claimant to provide paperwork regarding arrangements with the contractor, such as the relevant contracts and summaries of the repairs to be completed.  (*Id.*)  Moreover, Nationstar sought written assurances from the claimant that they intended to use all the funds to repair the property and required the claimant to submit invoices documenting the repair work.  (*Id.* at PageID 900.)

The Indictment alleges that Higgins retained Company A as the contractor, but he did not

---

[1] None of Johnson's opinions or anticipated testimony appears to relate to the witness tampering or witness retaliation counts.

intend to have Company A perform the bulk of the needed repairs. (*Id*. at PageID 901.) Instead, Higgins had Company A divert insurance funds for his personal use. (*Id*. at PageID 902.) Higgins further had Company A complete cosmetic repairs in order to convince Nationstar to authorize further disbursals of the claim funds. (*Id*. at PageID 902-03.) Company A subsequently withdrew as the contractor, and Higgins retained Protech to serve as the new contractor. (*Id*. at PageID 903.) Higgins allegedly concealed that he owned or otherwise controlled Protech and that the company was not a licensed contractor. (*Id*. at PageID 903-04.) The Government alleges that Higgins took these actions in an effort to divert the claims funds for his own personal use. (*Id*.) The Government also alleges that Higgins submitted, and caused to be submitted, paperwork that materially misrepresented repairs performed or intended to be performed on the Meeker Residence—including that he falsely submitted paperwork asserting to Nationstar that he intended to use all claim funds held by Nationstar to repair the Meeker Residence. (*Id.*)

### b. **Johnson's Expert Report**

On March 31, 2021, Higgins provided the Government with Johnson's expert report. (Doc. No. 91 at PageID 856.) Higgins further provided the Government with Johnson's *Curriculum Vitae*, a list of documents Johnson relied on in reaching his opinions, and a list of cases Johnson had previously participated in. (*Id*.) Johnson's expert report states a total of nine opinions:

1. Mr. Higgins had an insurable interest in the Meeker Residence;

2. Nationstar and Assurant should have included Mr. Higgins as a Borrower on the Assurant Certificate along with Chonda Higgins, but they neglected to do so;

3. Because of Mr. Higgins' insurable interest, and for other reasons, Mr. Higgins had a reasonable expectation to receive portions of the Actual Cash Value (ACV) payment made by Assurant;

4. The estimate of repairs to the Meeker Residence follows the form and style of other property damage repair estimating tools found in the insurance industry, similar to Xactimate, and cannot be relied upon as an EXACT repair cost for

3

this claim;

5. Assurant and Nationstar knew that Chonda Higgins had abandoned the Meeker Residence and was living in another state. Without the cooperation of Chonda Higgins, Assurant could only rely upon Nationstar, the NAMED INSURED, to manage the claim and repairs to the Meeker Residence; both Nationstar and Assurant were reckless in their handling of this claim and disbursement of funds to others not insured under the Certificate;

6. Assurant and Nationstar's inspection of on-going repairs indicated the work was being done and that they were satisfied with the work;

7. Mr. Higgins followed the Terms and Conditions of the Nationstar Mortgage documents;

8. Any inference that Mr. Higgins was involved in insurance fraud isn't supported by the records reviewed; and

9. The Certification of Intent to Repair was null, void, defective and unauthorized – Assurant and Nationstar had no contractual relationship with Mr. Higgins and no authorization to transact business with him, therefore all communications, written and verbal, with Mr. Higgins, were voluntary.

(Doc. No. 76-1.)

The Government requested a *Daubert* hearing on April 30, 2021 (Doc. No. 76), and the Court held such a hearing on October 6, 2021. The Government then filed the present Motion on November 8, 2021 (Doc. No. 91) and Higgins responded on December 13, 2021 (Doc. No. 94). The Government filed its reply on December 23, 2021. (Doc. No. 98.) This issue is fully briefed and ripe for review.

## II.   OVERARCHING STANDARD FOR ADMISSION OF EXPERT TESTIMONY

Under Federal Rule of Evidence 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if four requirements are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court plays a "gatekeeping" role with respect to expert testimony regarding scientific, technical or other specialized knowledge. *Kumho Tire v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). "As gatekeeper, the trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 453 (6th Cir. 2013) (internal quotation marks and citation omitted). Put simply, for expert testimony to be admissible, the court must find: (1) the expert is qualified; (2) the testimony is relevant; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 589; *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). The party offering the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

## III.    **ANALYSIS**

### a.    **Qualifications**

To qualify as an expert under Rule 702, a witness must first establish their expertise by reference to "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Pride*, 218 F.3d at 577. Moreover, the expert's training and qualifications must relate to the subject matter of the proposed testimony. *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 303 (6th Cir. 1997), *cert. denied*, 522 U.S. 817, 118 S. Ct. 67, 139 L. Ed. 2d 29 (1997); *U.S. Diamond & Gold v. Julius Klein Diamonds LLC*, No. C-3-06-371, 2008 U.S. Dist. LEXIS 116112, at *7, 2008 WL 4116090 (S.D. Ohio Aug. 28, 2008).

The Government argues that Johnson should be excluded because he has never testified in a criminal trial before and he lacks familiarity with the federal mail fraud statute. (Doc. No. 91 at PageID 861.) In response, Higgins argues that Johnson "is eminently qualified to opine on insurance claims and insurance industry practices" and that his testimony "will assist the jury in understanding the complex insurance issues at play is [sic] this matter." (Doc. No. 94 at PageID 875.) Higgins highlights Johnson's years of experience in the insurance industry. (*Id.* at PageID 879.) Higgins further argues that Johnson's lack of experience testifying in criminal trials and his lack of familiarity with the mail fraud statute are irrelevant to the Court's analysis. (*Id.* at PageID 879-80.)

Johnson's *Curriculum Vitae* states that he has been a licensed attorney for thirty-three years. (Doc. No. 76-2 at PageID 743.) It further states that he has worked in the insurance industry, in various claims related roles, for nearly forty years. (*Id.* at PageID 744-45.) For instance, Johnson was the corporate claims counsel for State Auto Insurance Company for six years and a vice president of claims operations for XL Insurance Company for seven years prior to starting his consulting firm, Highbanks Insurance Professionals in 2014. (*Id.* at PageID 746.)

The fact that Johnson has not testified in a criminal trial before and is not familiar with the mail fraud statute do not negate the fact that he has decades of experience in the insurance industry working on claims-related issues for various insurance companies. If the Court were to exclude every proposed expert from testifying at a criminal trial because they had never previously testified in a criminal trial, then it would be difficult to qualify any person as an expert, regardless of their competence.

However, Johnson has never worked for a mortgage company and he has never handled the processing of claims from the perspective of a mortgage company in a situation similar to this

one. Johnson's relevant experience in the context of this matter is limited to an insurance company's role in the claims process. Therefore, the Court finds Johnson is qualified to testify regarding the insurance claims process.

### b. **Relevance**

Expert testimony must be relevant, meaning that it will "'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015) (*quoting United States v. Freeman*, 730 F.3d 590, 599-600 (6th Cir. 2013)); Fed. R. Evid. 702(a). An expert's testimony is not relevant if it does not relate to any issue in the case. *Daubert*, 509 U.S. at 591; *Johns v. CR Bard*, No. 2:18-MD-2846, 2021 U.S. Dist. LEXIS 119665, at *54 (S.D. Ohio June 28, 2021).

In determining whether an expert's testimony is relevant, "'a consideration of Rule 403 is included in the *Daubert* analysis.'" *United States v. Lavictor*, 848 F.3d 428, 444 (6th Cir. 2017) (quoting *United States v. Semrau*, 693 F.3d 510, 522 (6th Cir. 2012)). Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Committee Notes. Evidence is not unfairly prejudicial merely because it has an adverse effect on the defense; unfair prejudice occurs only when "the jury responds negatively to some aspect of the evidence unrelated to its tendency to make the contested fact more or less probable." *United States v. Savinovich*, 845 F.2d 834, 837 (9th Cir. 1988).

The Government argues that Johnson's opinions are not probative of or helpful in

understanding the disputed facts relevant to the mail fraud statute. (Doc. No. 91 at PageID 863.) The Government further argues the report improperly focus on the obligations of Higgins, Assurant, and Nationstar under the insurance contract and the mortgage. (*Id*.) Moreover, the Government argues that Johnson's opinion impermissibly seeks to show Nationstar was negligent in its handling of this claim. (*Id*. at PageID 864.) Finally, the Government argues Johnson's report refers to a number of ancillary matters that are irrelevant to the dispute at hand. (*Id*.)

In response, Higgins argues that Johnson's testimony is critical "to untangle the complicated web of relationships between the various parties, place the case within the context of how insurance claims such as this are typically handled, and walk the jury through how this claim was handled." (Doc. No. 94 at PageID 881.) Higgins also argues that Johnson's opinions are relevant to his arguments that "(1) any misstatements made by Mr. Higgins were not 'material' as required by the mail fraud statute, and (2) the various victims were not deprived of any money or property as contemplated by those statutes." (*Id*. at PageID 885.) Finally, Higgins argues that Johnson's testimony is necessary to educate the jury on the terms and concepts relevant to the world of insurance. (*Id*. at PageID 886-87.)

### i.  <u>Mail Fraud Statute</u>

The federal mail fraud statute makes it a crime to "devise any scheme . . . for obtaining money . . . by means of false or fraudulent pretenses," when "for the purpose of executing such scheme" a person causes "any matter or thing . . . to be delivered by mail." 18 U.S.C. § 1341; *see United States v. Ormsby*, 225 Fed. App'x 383, 385 (6th Cir. 2007). The essential elements of mail fraud are:

(A) First, that the defendant knowingly participated in a scheme to defraud in order to deprive another of money or property;

(B) Second, that the scheme included a material misrepresentation or concealment of a material fact;

(C) Third, that the defendant had the intent to defraud; and

(D) Fourth, that the defendant used the mail or caused another to use the mail in furtherance of the scheme.

*See* Sixth Circuit Pattern Jury Instructions § 10.01 (2021). Notably, reliance is not an element of mail fraud. *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1993). Neither is damages. *Neder v. United States*, 527 U.S. 1, 24-25 (1999). This contrasts with the elements of common-law fraud. *Id.* (explaining that "[t]he common-law requirements of 'justifiable reliance' and 'damages' … have no place in the federal fraud statutes").

Regarding Higgins' argument that Johnson's opinions are relevant because they help demonstrate that "the various victims were not deprived of any money or property as contemplated by those statutes" (Doc. No. 94 at PageID 885), the Court disagrees. Again, damages are not an element of criminal mail fraud. *Neder*, 527 U.S. at 24-25. Moreover, the mail fraud statute does not require proof that the victim was actually defrauded, or, put differently, the actual success of the scheme to defraud is not an element of the statute. *Merklinger*, 16 F.3d at 678; *United State v. Warshak*, 631 F.3d 266, 310 (6th Cir. 2010); *United States v. Rathburn*, 771 Fed. App'x 614, 622 (6th Cir. 2019). In short, whether the alleged victim was, in fact, actually deprived of any money or property is not determinative. *See* Sixth Circuit Pattern Jury Instructions § 10.01 (requiring that "the defendant knowingly participated in a scheme to defraud in order to deprive another of money or property" and that "the defendant had the intent to defraud"); *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (the jury must "find either that the victim was actually deprived of money or property *or* that the defendant intended to defraud the victim of the same") (emphasis in original); *U.S. v. Standard Drywall Corp.*, 617 F. Supp. 1283, 1291 (E.D.N.Y. 1985) ("[i]t is not necessary for the government to prove that the alleged scheme actually deprived any person of money or tangible property").

9

Regarding Higgins' argument that Johnson's opinions are relevant because they will help demonstrate that "any misstatements made by Mr. Higgins were not 'material' as required by the mail fraud statute" (Doc. No. 94 at PageID 885), the Court notes that Johnson confirmed at the *Daubert* hearing that he was not drawing any conclusions about whether any misrepresentations were material. (Doc. No. 90 at PageID 842.) Thus, Johnson himself rebuts Higgins' position. Regardless, the Court will consider the relevancy of Johnson's opinions in the context of Higgins' stated goal to educate the jury on the complex world of insurance claims, as well as the requirement that the alleged scheme include a material misrepresentation or concealment of a material fact. *See* Sixth Circuit Pattern Jury Instructions § 10.01. A misrepresentation is material "if it has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension." *United States v. Maddux*, 917 F.3d 437, 448 (6th Cir. 2019); *see also Neder*, 527 U.S. at 16.

### ii. Opinion 1: Mr. Higgins had an insurable interest in the Meeker Residence.

Johnson's first "opinion" lists a number of facts purporting to demonstrate that Higgins had an insurable interest in the Meeker Residence. However, this point is not in dispute, as Johnson's own expert report recognizes. (Doc. No. 76-1 at PageID 734 (quoting from the Second Superseding Indictment); Doc. No. 95 at PageID 895 (Fourth Superseding Indictment stating that "Defendant Brian Higgins held an interest in the Meeker Residence").) The Court will allow Johnson to testify to this undisputed fact.

However, the Government does not allege that Higgins engaged in mail fraud by making a claim under the insurance policy, despite him not being formally listed on the insurance policy. (Doc. No. 91 at PageID 864.) Therefore, Johnson should not provide testimony that would suggest otherwise; doing so would impermissibly confuse the issues or mislead the jury.

10

### iii. Opinion 2: Nationstar and Assurant should have included Mr. Higgins as a Borrower on the Assurant Certificate along with Chonda Higgins, but they neglected to do so.

Johnson's second opinion states that Nationstar neglected to include Higgins as a "Borrower" or Primary Additional Insured on the insurance policy with Assurant. However, as explained immediately above, Higgins has not been charged with mail fraud for filing a claim with the insurance company. Moreover, the fundamental issue with this opinion is that an alleged victim's negligence is not a defense to mail fraud and does not negate any of the elements of the mail fraud statute. *United States v. Frenkel*, 682 Fed. App'x 20, 22 (2nd Cir. 2017); *United States v. Vance*, 2018 U.S. Dist. LEXIS 123465, at *5, 2018 WL 3557380 (E.D. Ky. June 24, 2018). Indeed, multiple circuits have held that a victim's negligence is not a defense to mail or wire fraud. *United States v. Thomas*, 377 F.3d 232, 240-43 (2nd Cir. 2004); *United States v. Hoffecker*, 530 F.3d 137, 177 (3rd Cir. 2008); *United States v. Powell*, 509 Fed. App'x 958, 967 (11th Cir. 2013); *United States v. Lindsey*, 850 F.3d 1009, 1015-16 (9th Cir. 2017). In a similar vein, the defendant may not blame the victim for being duped by a scheme to defraud.[2] *United States v. Coffman*, 94 F.3d 330, 333-34 (7th Cir. 1996); *Thomas*, 377 F.3d at 243.

While this opinion does not overtly accuse Nationstar of negligence, the implication is clear. For instance, Johnson's opinion specifically points out "that Mr. Higgins was referred to

---

[2] These principles are separate from the materiality assessment, which focuses on assessing the intent of the defendant (whether the scheme to defraud included a misrepresentation intended to defraud a person or ordinary prudence and comprehension). *See United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998) (the mail fraud statute "require[s] a specific intent to defraud" which "means not only that a defendant must knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission"). The focus of the materiality assessment is not on the alleged victim; a defendant may have the requisite intent regardless of whether a victim was negligent or reckless—or extremely vigilant. *Thomas*, 377 F.3d at 241-42 ("[t]he role of the ordinary prudence and comprehension standard is to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless"; rejecting defendant's arguments that the alleged victim's vigilance, or lack thereof, was relevant and that there can be no fraud if the victim did not act as a person of ordinary prudence and comprehension would).

repeatedly in the first few months of this claim as an unauthorized person when he called in to speak with someone at Nationstar." (Doc. No. 76-1 at PageID 735.) Johnson's apparent effort to cast Nationstar as negligent, reckless, or incompetent in its handling of the claim on the Meeker Residence impermissibly confuses the relevant issues in this case and creates a danger that the jury will be misled. Such an effort would inherently suggest to the jury that Nationstar is to blame for enabling Higgins alleged fraud. *United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007) (affirming district court's decision to exclude expert witness from testifying; "the perpetrator of a fraud may not defend himself by blaming the victim for being duped"). Therefore, the Court excludes testimony regarding Johnson's second opinion.

### iv. Opinion 3: Because of Mr. Higgins' insurable interest, and for other reasons, Mr. Higgins had a reasonable expectation to receive portions of the Actual Cash Value (ACV) payment made by Assurant.

The third opinion in Johnson's report states that Higgins would be entitled to receive a portion of the Actual Cash Value ("ACV") payment made by Assurant for the damage to the Meeker Residence. (Doc. No. 76-1 at PageID 735.) Johnson explains what ACV is and how it can be distributed in different circumstances. (*Id*.) The opinion then goes on to state:

> While the Mortgage does have language indicating that claims funds will be used to repair the property, it doesn't have a provision that requires a Borrower to sign a contract addendum or other form that, in essence, uses similar language. There is no authority in the Nationstar Mortgage that would require Mr. Higgins or Chonda Higgins to sign and return the Certification of Intent to Repair.

(*Id*. at PageID 735-36.) Johnson then opines that Higgins would reasonably have expected to be compensated out of the ACV funds. (*Id*. at PageID 736.)

A portion of Johnson's opinion is permissible. An explanation of ACV would aid the jury because it defines a specific term of art. Johnson is permitted to give a general explanation of what ACV is in the context of insurance claims.

However, the predominant issue with the remainder of the opinion concerns interpreting contractual language. Johnson's opinion incorrectly suggests that making a representation that is not required by a contract precludes the representation from being part of a mail fraud scheme. 18 U.S.C. § 1341; *see also United States v. Belt*, No. CR 07-10018, 2010 WL 3938354, at *2 (W.D. La. Oct. 4, 2010) ("[t]he mail fraud statute does not require a defendant[] who … is also charged as a principal under 18 U.S.C. § 2, have a contractual relationship of any kind before she can 'cause' the mails to be used in violation of 18 U.S.C. § 1341"). Johnson confuses principles of mail fraud with principles of breach of contract actions and/or common law fraud. Contract law and interpretation, in cases such as this, are irrelevant to mail fraud charges. *United States v. Rathbun*, 771 Fed. Appx. 614, 626 (6th Cir. 2019) ("Michigan contract law is irrelevant to the federal charge of wire fraud"); *United States v. Devos Ltd.*, No. 14-574, 2019 U.S. Dist. LEXIS 9557, *184 (E.D. Pa. Jan. 17, 2019) ("[t]he central issue in this case was not whether [the defendant] acted reasonably within the confines of the contract, rather . . . whether [the defendant] had specific intent to defraud having knowingly devised a scheme to defraud"). Johnson's opinion(s) regarding contractual requirements are irrelevant or, at least, create a danger of impermissibly confusing the issues or misleading the jury; instead, it would only be appropriate for him to "clarify or define terms of art, science, or trade." *North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) (*citing TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir. 1981)); *see also United States v. Amawi*, 695 F.3d 457, 479-80 (6th Cir. 2012) (affirming district court's decision to grant motion to exclude testimony from expert witnesses because the proposed testimony's probative value was substantially outweighed by its tendency to confuse the issues in the case, where the defense had argued the testimony was necessary to understand

13

innocent explanations for defendants' conduct, but there was a "very weak link, if any" between the proposed testimony and the actual charge in the indictment in contrast to a crime not charged).

Indeed, whether a contract required Higgins to perform certain tasks and not others does not preclude Higgins from making material misrepresentations or intending to defraud Nationstar. And, allowing Johnson to testify about his interpretation of a contract and opine on duties under that contract has a high likelihood to confuse the issues between contract law principles and mail fraud principles, with that potential confusion substantially outweighing any probative value. If Higgins elected to complete documents, such as the Certification of Intent to Repair, and mail them to Nationstar, then whether the mortgage or any other contract required him to do so has limited, if any, relevance to the question of whether he made material misrepresentations and intended to defraud Nationstar through those misrepresentations. Therefore, the Court excludes testimony regarding Johnson's third opinion except that he may provide an explanation of ACV and what is usual and customary in the insurance industry concerning such funds.

> ### v. Opinion 4: The estimate of repairs to the Meeker Residence follows the form and style of other property damage repair estimating tools found in the insurance industry, similar to Xactimate, and cannot be relied upon as an EXACT repair cost for this claim.

The fourth opinion in Johnson's report states that the repair estimates of the Meeker Residence were done using software commonly used throughout the insurance industry. (Doc. No. 76-1 at PageID 736.) Johnson further opines that these tools can overestimate and underestimate the actual cost of repairs depending on local factors and the contractor who is ultimately employed to complete the work. (*Id*. at PageID 736-37.)

Johnson's general knowledge of initial repair estimates would aid the trier of fact in understanding how the insurance claims process works. Indeed, explaining to a jury that the costs of repairs can vary depending on the contractor used, the availability of material locally, and other

specific factors that may affect the accuracy of an estimate would aid the jury in understanding why claims may vary from the initial estimate of repair costs.

However, the Court highlights that this opinion is limited. Johnson has not attempted to apply his knowledge of repair estimate tools to specific estimates or representations in this case, beyond stating that the tool used by Assurant is commonly used throughout the industry. Therefore, Johnson is not precluded from testifying in accordance with his fourth opinion (i.e., general principles surrounding repair estimating tools), but may not testify beyond its parameters, e.g., opine on whether the estimates provided in this instance were appropriate, opine on whether claims made by Higgins were appropriate based on the repair estimate, etc.

> ### vi. Opinion 5: Assurant and Nationstar knew that Chonda Higgins had abandoned the Meeker Residence and was living in another state. Without the cooperation of Chonda Higgins, Assurant could only rely upon Nationstar, the NAMED INSURED, to manage the claim and repairs to the Meeker Residence; both Nationstar and Assurant were reckless in their handling of this claim and disbursement of funds to <u>others not insured under the Certificate.</u>

Johnson's fifth opinion states that Assurant and Nationstar were reckless in the way they handled the insurance claim and the disbursement of funds. (Doc. No. 76-1 at PageID 737.) Johnson opines that, because Chonda Higgins believed her divorce from Higgins resolved any connection to the Meeker Residence, it was Nationstar's contractual duty to secure a contractor. (*Id*. (opinion that "[a]t this point, it was Nationstar's responsibility under the terms of the insurance Certificate to secure a credible contractor to assure repairs").) Johnson further states that Nationstar knew the Meeker Residence was in financial distress and it was "reckless in [its] handling and disbursement of claim funds with knowledge of Mr. Higgins apparent struggles with money management." (*Id*.)

This opinion is impermissible for the same reasons as Johnson's second opinion. A victim's negligence or recklessness is not a defense to mail fraud. *See supra* Section III.b.iii. Indeed, experts have been excluded for opining that a victim could have discovered fraud through proper due diligence. *Serfling*, 504 F.3d at 676, 679. Therefore, the Court excludes testimony regarding Johnson's fifth opinion.

### vii. Opinion 6: Assurant and Nationstar's inspection of on-going repairs indicated the work was being done and that they were satisfied with the work.

Johnson's sixth opinion states that the documents available to him show repairs to the Meeker Residence were 65% complete on December 9, 2014, when the contractor was terminated. (Doc. No. 76-1 at PageID 738.) Johnson opines that the termination of a contractor can create delays and increase the cost of the final repairs, leading to supplemental requests for additional claims. (*Id.*) Johnson further opines that if Nationstar's "representative failed to properly inspect, timely inspect, or inspect in a reasonable manner or detail, the work being performed, then that is a failure solely attributable to them." (*Id.*) He also opines that "[i]t would be a fairly easy periodic inspection process," and, "[w]ith all due respect these are not the type of repairs that are somehow easily hidden, concealed or camouflaged." (*Id.*)

The Court finds that Johnson may testify to the general practices involved in inspecting on-going repairs to insured properties. However, Johnson first will need to establish that methods used by insurance companies are the same as those used by mortgage companies. *Smelser*, 105 F.3d at 303 (the expert's training and qualifications must relate to the subject matter of the proposed testimony). As found above, Johnson's relevant experience in the context of this matter is limited to an insurance company's role in the claims process, while his sixth opinion relates to conduct by Nationstar—a mortgage company, not an insurance company. Johnson may also testify

16

to the type of paperwork that would be generated and what would need to be included in that paperwork, again with the same restriction that he establishes the paperwork is common between insurance companies and mortgage companies.

However, the bulk of Johnson's sixth opinion once again lays blame on Nationstar, this time for not identifying allegedly fraudulent repairs. Such an opinion impermissibly seeks to blame the victim and assert it was negligent. *See supra* Section III.b.iii. Therefore, the Court excludes testimony regarding Johnson's sixth opinion except that Johnson may testify to the general practices for inspections of on-going repairs to insured properties and what those inspections would entail from an insurance claims perspective.

### viii. Opinion 7: Mr. Higgins followed the Terms and Conditions of the <u>Nationstar Mortgage documents.</u>

The seventh opinion in Johnson's report interprets contractual documents and opines on parties' obligations pursuant to those documents. As the Court has previously explained with respect to Opinion 3, this is irrelevant or, at least, would create an impermissible danger of confusing the issues or misleading the jury. *See supra* Section III.b.iv. Additionally, Johnson's opinion once again impermissibly confuses the issues by attempting to shift blame to Nationstar by arguing that "Nationstar was notably satisfied with the work and progress" (Doc. No. 76-1 at PageID 739). *See supra* Section III.B.iii. Therefore, the Court excludes testimony regarding Johnson's seventh opinion.

### ix. Opinion 8: Any inference that Mr. Higgins was involved in insurance <u>fraud isn't supported by the records reviewed.</u>

The eighth opinion in Johnson's report states that Assurant sent Higgins a letter accusing him of fraud. (Doc. No. 76-1 at PageID 739.) He opines that Assurant conducted a deficient investigation and its letter is filled with inaccuracies. (*Id.* at PageID 740.)

The Government argues that this opinion violates Federal Rule of Evidence 704(b), which prohibits an expert witness from opining on whether a defendant had the mental state to commit the charged crime. *Warshak*, 631 F.3d at 324. Both parties cite to *United States v. Harris*, 393 F. App'x 314, 319 (6th Cir. 2010), as the source of the relevant inquiry the Court should make when faced with an issue under Rule 704. In *Harris*, the Sixth Circuit explained:

> A crucial inquiry is 'whether the expert actually referred to the intent of the defendant or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent.'

*Id*. (quoting *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004)). Johnson's opinion does not specifically state that Higgins did not have the intent to defraud, nor does this opinion intimate that Higgins conducted himself in a certain manner, leaving only the conclusion that he did not have the intent to defraud. Instead, Johnson states that Assurant acted improperly, both in its investigation and drafting of the letter. Therefore, Johnson's opinion is not barred by Rule 704.

However, that does not end the inquiry. Johnson's opinion once again boils down to victim blaming and confuses the issues. Higgins is charged with mail fraud, not common law "insurance fraud." His opinion criticizes Assurant for sending the fraud letter, the contents of the fraud letter, and Assurant's investigation of potential fraud. (Doc. No. 76-1 at PageID 740.) For some of the same reasons concerning his earlier opinions, Johnson's testimony concerning his eighth opinion is excluded.

**x. Opinion 9: The Certification of Intent to Repair was null, void, defective and unauthorized – Assurant and Nationstar had no contractual relationship with Mr. Higgins and no authorization to transact business with him, therefore all communications, written and <u>verbal, with Mr. Higgins, were voluntary.</u>**

Johnson's ninth and final opinion states that the Certification of Intent to Repair does not appear anywhere in the Nationstar mortgage. (Doc. No. 76-1 at PageID 740-41.) He further opines that the language in the mortgage document does not permit Nationstar to withhold payments in the absence of the Certification of Intent to Repair. (*Id*. at PageID 741.) Finally, Johnson states that the typical remedy for the breach of the terms of a mortgage agreement or of a Certification of Intent to Repair is a civil contract action. (*Id*. at PageID 742.)

This opinion is inadmissible for the same reasons as his third and seventh opinions. *See supra* Sections III.b.iv, viii. Moreover, whether the facts presented may result in "a civil contract action" is entirely irrelevant to whether Higgins is innocent or guilty of the mail fraud charges. It has absolutely no tendency to make a fact more or less probable, and it only serves to confuse the issues or mislead the jury. Fed. R. Evid. 401, 403. Therefore, Johnson's testimony concerning his ninth opinion is excluded.

**c. <u>Reliability</u>**

As to the final prong of the Court's inquiry as gatekeeper, the Government argues that Johnson's opinions are not reliable because he focused solely on the documents in the insurance claims file and did not consider whether those documents were falsified. (Doc. No. 91 at PageID 866.) The Government argues that simply taking the documents at face value "misses the entire point of the alleged criminal fraud." (*Id*.) In response, Higgins argues that the Government's challenge goes to the facts he relied upon and not the actual reliability of the methodology he employed—in this instance, his experience in the insurance claims industry. (Doc. No. 94 at

19

PageID 888.)

"A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). The Supreme Court, in *Daubert*, identified several factors that bear on reliability (509 U.S. at 593-94); however, those factors are neither definitive nor exhaustive. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006); *Newell Rubbermaid,* 676 F.3d at 527. In certain cases, an expert's experience may provide a reliable basis for their testimony. Fed. R. Evid. 702; *see also Nestor v. Everlast Roofing, Inc.*, No. 3:17-CV-93, 2018 U.S. Dist. LEXIS 171513, at *4, 2018 WL 4784554 (S.D. Ohio Oct. 4, 2018). The Sixth Circuit has instructed:

> [A]n expert's opinion ... should be supported by good grounds, based on what is known. The expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions. An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th Cir. 2000) (internal quotations and citations omitted); *Nestor*, 2018 U.S. Dist. LEXIS 171513, at *4-5. "An expert need not consider every possible factor to render a 'reliable opinion;' rather the expert need only consider enough factors to make his or her opinion sufficiently reliable in the eyes of the court." *In re GM OnStar Litig.*, No. 2:07-MDL-01867, 2011 U.S. Dist. LEXIS 16139, at *36, 2011 WL 679510 (E.D. Mich. Jan. 12, 2011) (internal citation and quotation omitted), *report and recommendation adopted by* 2011 U.S. Dist. LEXIS 15671, 2011 WL 674727 (E.D. Mich. Feb. 16, 2011). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

The Government's reliability arguments rest on the notion that Johnson has not considered the documents in the claims file in the correct light, i.e., he did not conduct a review of the documents that considered whether some might be fraudulent, and he did not consider all the documents the Government deems relevant. The first argument is resolved by this Court's rulings on relevance. Johnson essentially will be limited to testifying to basic principles of the insurance claims process. The second argument goes to weight rather than admissibility. The Government will have every opportunity to explore the thoroughness of Johnson's expert opinion by, for example, highlighting for the jury documents he did not consider in reaching his opinions. Therefore, the Court finds Johnson's opinions, to the extent they have been deemed relevant, are reliable.

## IV. **CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Government's Motion to Exclude Testimony of Proposed Defense Expert. In general, most of Johnson's opinions are barred because they are irrelevant or any probative value is substantially outweighed by a danger of confusing the issues and misleading the jury, but he may testify to certain items—most of which relate to terms used and general practices in the insurance claims industry. *See United States v. Palamarchuk*, 791 F. App'x 658, 660 (9th Cir. 2019) (affirming district court's decision to preclude appellant from introducing proffered expert testimony in mail fraud case; appellant's expert intended to testify about the conduct and motives of the victim lenders, not about the standards and general practices of the mortgage industry).

Johnson's opinions must follow the general guidelines listed below and the Court will entertain any objection that his opinions deviate from these guidelines at trial.

1. Johnson's second, fifth, seventh, eight, and ninth opinions are excluded in their

entirety;

2. Johnson may testify to the undisputed fact set forth in his first opinion, that Higgins had an insurable interest in the Meeker Residence;

3. Johnson's third opinion is admissible solely to define Actual Cash Value ("ACV") for the trier of fact, to explain when and how ACV would be dispersed (what is usual and customary in the insurance industry concerning such funds), and to explain what purposes it would typically be used for;

4. Johnson's fourth opinion is admissible to the extent he testifies to the general principles surrounding repair estimating tools, such as factors that may affect the accuracy of the estimate. Johnson may confirm whether the tools used in this case are commonly used in the industry. Johnson may not opine on whether the estimates provided in this instance were appropriate, nor may Johnson opine on whether claims made by Higgins were appropriate based on the repair estimate;

5. Johnson's sixth opinion is inadmissible with the exception that Johnson may testify to the general practices involved in inspecting on-going repairs to insured properties. He may also testify to the type of paperwork that would be generated and what would need to be included in that paperwork. In both instances, Johnson will first need to establish that the practices used in the insurance industry are the same as those used in the mortgage industry; and

6. Johnson may clarify or define terms of art, science, or trade relevant to the insurance claims industry.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, January 4, 2022.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE